**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. ______________**

JONAH COBB AND RACHEL COBB,
EACH INDIVIDUALLY AND AS NEXT
FRIENDS TO M.C. AND N.C.,

Plaintiffs,

v.

THE MICHAELS ORGANIZATION, LLC,
AMC East Communities, LLC, and MMS Air
Force, LLC,

Defendants.
_____________________________________________/

**COMPLAINT**

Plaintiffs, Jonah Cobb, a Gunnery Sergeant in the United States Marine Corps stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), and his family suffered personal injuries because they lived in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiffs' housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of their residence. Moreover, Defendants concealed these conditions from Plaintiffs through false and misleading statements and the failure to disclose known hazards. When these conditions were discovered, Defendants failed

to properly repair and remediate them. Plaintiffs bring this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1. Plaintiffs JONAH COBB and RACHEL COBB resided at MacDill Air Force Base in Tampa, Florida at all times relevant to this Complaint. JONAH COBB and RACHEL COBB are the parents of Plaintiffs M.C. and N.C., who also resided at MacDill at all relevant times.

2. Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3. Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Upon information and belief, AMC is listed as the "Owner" on the lease signed by the Plaintiffs.

4. Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5. Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and maintenance activities relating to military housing at MacDill. Upon information and

belief, it presents itself as the landlord, appearing as the "Landlord/Lessor" on Mold Addenda, even though, upon information and belief, Defendant AMC is the owner or the lessor on the leases. Upon information and belief, Harbor Bay is also listed as the Community Manager on Plaintiffs' lease and the lease addenda. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6. In related litigation, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiffs allege the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiffs' claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive legislative jurisdiction in 1950. Plaintiffs are aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave. Because the acts and omissions giving rise to Plaintiffs' claims occurred on an exclusive federal enclave, Plaintiffs' claims are governed by federal law under the Federal Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d 123, 124

(5th Cir. 1952).

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred within this District on the federal enclave at MacDill where Plaintiffs were exposed to the conditions at issue.

9. This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein which occurred at MacDill. FLA. STAT. §§ 48.193(1)(a)(2),48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10. In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11. Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled. In addition, MHPI contractors typically receive performance incentive fees,

payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12. In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. § 2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13. Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and, if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(4).

**MHPI Housing at MacDill**

14. In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels, either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15. Plaintiffs paid their BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16. Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

**Defendants' Joint and Integrated Approach to MacDill Housing**

17. Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill housing.

18. With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19. The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail addresses and signature blocks suggest that they are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20. Defendants were bound in agency and alter-ego relationships in leasing,

operating, managing, maintaining, and repairing the homes at MacDill.

**The Unsafe and Unhealthy Housing Conditions at MacDill**

21. Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22. For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or contained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23. Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

**The Cobb Family**

24. Gunnery Sergeant (GySgt) Jonah Cobb, United States Marine Corps ("USMC"), his spouse, Rachel Cobb, and their minor children, M.C. and N.C., resided at 7414 Chevron Park Drive from approximately January 9, 2024, through October 17, 2025.

25. GySgt Cobb entered into a lease with Defendants prior to moving into the residence. Upon information and belief, Plaintiffs' lease listed AMC as the Owner and Michaels Management Services, Inc., or its successor, as the Property Manager,

and provided that Florida law governed the lease.

26. GySgt Cobb signed the lease and was provided a 7 year maintenance history of the home before the walkthrough and final acceptance of the residence. On information and belief, the 7-year history contained evidence of HVAC issues and indicated that Harbor Bay inspected the unit's HVAC. The Cobbs understood this to mean that prior repairs had been completed, and that the home's HVAC was in good, working condition. That would prove to not be the case.

27. During the walkthrough and before accepting the residence, Ms. Cobb specifically raised concerns about the condition of MacDill housing with Harbor Bay Assistant Community Director Geri Leto and an unknown Harbor Bay technician. Ms. Cobb also specifically asked if there were any problems with the air conditioning or moisture in home they were offered. In response, the unknown Harbor Bay maintenance technician assured the Cobbs that prior repairs had been completed, that "there would be no issues," and that management was "aggressive with remediation." Ms. Leto also told Ms. Cobb that MacDill housing was "safe, clean, and sturdy" and in "much better and more livable condition" than housing at other military installations. Based on these statements, the family was further assured that the residence would be free from mold and pests.

28. During this walkthrough, GySgt Cobb identified a cracked shelf within the master shower that appeared to have been patched with spackle. When asked about the cracked shelf, the unknown Harbor Bay maintenance technician said that the shelf would be repaired if the condition worsened or the existing repair failed.

29. The Cobbs relied on all the pre-occupancy representations of Geri Leto and this unknown Harbor Bay maintenance employee in accepting the residence and moving their children into the home. The name of the unknown Harbor Bay employee is known to Defendants and within their possession, custody, or control, but the Cobb family recalls he was shorter in height than GySgt Cobb, middle aged, had worked for Harbor Bay for many years, and had thinning black hair.

30. During their tenancy, Plaintiffs came into contact with pests, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

31. On the very night the family moved into the residence, the Cobbs reported hearing animals scratching inside the attic. Squirrels were inside the Cobbs' attic and ceiling cavities. They would remain a problem for about the next year and five months, despite repeated complaints to Ms. Leto, Mike Whitman, Harbor Bay's former Environmental Supervisor, and other maintenance personnel. Pest-control personnel placed approximately five traps in the attic over a period of a month or two, but failed to adequately investigate the attic and ceiling cavity above the master bedroom for nests, fecal matter, or additional entry points. The infestation persisted, and additional access points were not patched until after April 2025.

32. After moving into the home, the cracked shelf in the master bathroom became larger and more pronounced. The shelf broke after several weeks, and Harbor Bay personnel attempted to repair the shelf by adding more spackle. Those repairs

failed a few weeks later.

33. The HVAC system failed within approximately seven months of the family's move-in. The Cobbs endured interior temperatures exceeding 80 degrees for approximately two and a half weeks. The family submitted multiple maintenance requests. Every time technicians visited the home, they insisted there was "nothing wrong with the AC." The HVAC problem persisted while Harbor Bay continued to state that the air-conditioning system was functioning properly. Harbor Bay eventually displaced the family for about a month and replaced portions of the HVAC system, including the plenum and the air conditioner compressor.

34. The residence also experienced recurring water intrusion. After Hurricane Helene in September of 2024, the family returned from their mandatory evacuation and discovered standing water inside the entryway closet. The living room wall had cracks surrounding the room's large window, and all the way across the wall. The Cobbs documented the condition with photographs and reported it to Harbor Bay. Despite the photographic evidence, Mr. Whitman told the family that "there's nothing wrong" and dismissed the resulting water damage as "not that bad." The underlying moisture conditions continued throughout the tenancy. Frequently, when the Cobbs submitted a work order, it would be marked closed without any technician coming to the home. The water eventually evaporated or soaked into the carpet and walls, which—upon information and belief—caused mold to form.

35. The family was displaced for a second time lasting a month and a half. Harbor Bay replaced damaged insulation and drywall in the living room and back

bedroom. The family returned to find mold still growing from the vents, the bathtub was damaged, the cracks were still in the wall, and the entryway closet remained unrepaired.

36. Harbor Bay retained contractor InDepth Environmental ("IDE") to inspect the residence months after Hurricane Helene. IDE inspector Lane Middleton performed a visual inspection, identified mold in the AC vents, dirt outside the AC vents, and concluded that only vent cleaning and flooring repair were necessary.

37. During the inspection, GySgt Cobb specifically directed Mr. Middleton's attention to visible mold growth near the oven hood. Mr. Middleton dismissed the condition as "just dirt." GySgt Cobb insisted on having another inspection. During this second inspection, Mr. Whitman inspected the same area and acknowledged that the visible growth was "absolutely mold." Despite that acknowledgment, the mold identified near the oven hood was omitted from IDE's written report, and no formal mold testing was completed at that time.

38. In March of 2025, Harbor Bay technicians came to “repair” the cracks in the living room wall. Harbor Bay simply scraped the drywall and painted the wall and trim, masking the cracks.

39. In April of 2025, Harbor Bay returned to “finish the hurricane repairs.” This included repair work on the entryway closet. Harbor Bay replaced the bathtub, and finally removed the squirrels from the attic. When the bathtub was removed, mold was discovered behind the bathroom walls. The Cobb family was displaced during these repairs for a third time, with this displacement lasting a month and a half.

40. In September of 2025, an independent mold inspector discovered significant amounts of toxic mold in the Cobbs' home. Laboratory test results revealed an extremely high concentration of Penicillium and Aspergillus spores, known types of toxic mold, in the HVAC plenums and entryway closet.

41. The family was displaced for a fourth time, during which Harbor Bay finally replaced the home's flooring and began mold remediation.

42. Harbor Bay Community Director Candice Rosalez told the Cobbs that while their family was displaced, the home's HVAC system would remain operational and dehumidifiers would be placed inside the residence to control temperature and humidity. However, during two separate visits accompanied by maintenance personnel to retrieve belongings, GySgt Cobb observed that the HVAC system was turned off and no dehumidifiers were operating. He noticed that the containment installed during the remediation was deficient and poorly constructed, with plastic sheeting falling down. Mr. Whitman acknowledged that the containment was unsatisfactory and agreed that it appeared not to have been properly inspected. With the HVAC turned off, no dehumidifiers operating, and inadequate containment throughout the residence, the family's household belongings remained inside a hot and humid environment covered in drywall dust and mold while remediation activities occurred. This further exposed and contaminated their personal property. The Cobbs threw away half of their personal belongings after this displacement, as they were covered in mold and construction dust.

43. While Plaintiffs remained displaced for the fourth time, GySgt Cobb

demanded a new home. Harbor Bay initially attempted to transfer the Cobbs to another residence that had previously been the subject of mold complaints. Because of their experience in their first home, the Cobbs specifically requested to be present when that residence was inspected for mold. Harbor Bay did not honor this request and inspected this replacement residence without the family present.

44. When GySgt Cobb subsequently contacted the military housing office regarding the status of the proposed transfer, he learned that the offer had been rescinded. GySgt Cobb complained to his chain of command and the base housing officials. The family was not reassigned to their new home at 2012 Panama Canal Court until October 2025.

45. Plaintiffs' new home has gaps in the laminate flooring, cracked door handles, and a slew of cosmetic problems. The Cobbs' requests for basic maintenance have been delayed or canceled. However, given the fact that the Cobbs were displaced for over four months during their tenancy at MacDill, they felt forced to make the Hobson's choice of being displaced —again— for temporary repairs in their current home, which may not ultimately remedy the problems, or staying put in a minimally habitable house. Given the stress and disruption caused by the family's displacements, especially on the Cobbs' autistic son, and their distrust in Harbor Bay to make timely repairs, the family decided to remain in place rather than find themselves displaced once again.

46. The impact on the Cobb family of Defendants' acts and omissions with respect to Plaintiffs' MacDill housing has been substantial. Both GySgt and Ms. Cobb

ultimately required sinus surgery (sinuplasty), and their oldest child required surgical removal of his adenoids. Ms. Cobb suffered unexplained gastrointestinal pains and insomnia which improved when they moved away from the Chevron Park home. The entire family experienced persistent respiratory symptoms while residing in the home, which improved after relocation. The repeated environmental problems, displacements, and uncertainty surrounding the safety of their home caused substantial emotional distress and disruption to the family. Their youngest child spent his birthday living in a hotel while the family was displaced.

47. The Cobbs also sustained significant property losses. Among the items damaged or lost were their children's baby clothes, heirloom furniture, family photographs, artwork, and other personal belongings, including items that could not be replaced. GySgt Cobb also missed substantial time from his military duties while attempting to address the conditions within the residence and protect his family.

48. The Cobb family came into contact with and inhaled or ingested mold and other hazardous substances and suffered physical injuries, emotional distress, property damage, financial losses, and other damages as a direct result of Defendants' acts and omissions. Had the Cobbs known the true condition of the residence or that the representations concerning its safety, prior repairs, mold, and pest conditions were inaccurate, they would not have moved into or remained in the home. They continue to worry about the long-term consequences of their exposure.

49. Notwithstanding MacDill's status as a federal enclave, those of Plaintiffs' claims that seek recovery for personal injuries (including physical and emotional

injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law. Contemporary Florida law also governs Plaintiffs' claims because all of those claims arise out of Plaintiffs' injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiffs leased from Defendants, and, on information and belief, Plaintiffs' lease contains a choice of law provision selecting contemporary Florida law.

## CAUSES OF ACTION

### COUNT I: Breach of Contract (against Defendant AMC)

50. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

51. Plaintiffs had a valid lease with AMC. AMC owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, moisture, mold, and other issues. Plaintiffs have complied with all obligations under the lease.

52. AMC failed to comply with the material terms of the lease by failing to ensure Plaintiffs' house was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

53. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, financial damages, damages that require medical monitoring, and attorneys' fees and costs.

**COUNT II: Negligence**
**(against all Defendants)**

54. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

55. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home. Defendants negligently failed to meet the standard of care in performing those duties.

56. As the property owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain their home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

57. As property manager for Plaintiffs' MacDill home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

58. Defendants' acts and omissions in performance of their duties as Plaintiffs' lessors, landlords, and property managers fell far below the standard of care owed to Plaintiffs under Florida law.

59. Defendants' acts and omissions breached the duty of reasonable care

owed to Plaintiffs by failing to ensure that Plaintiffs' home was safe and fit for habitation.

60. Defendants breached the duty to exercise ordinary care in multiple respects, including: (a) failure to remediate defects they knew, or reasonably should have known, would cause moisture intrusion, elevated indoor humidity, and microbial growth; (b) failure to reasonably repair and remediate issues related to mold, moisture, and recurring water intrusion, including the standing water discovered in the entryway closet after Hurricane Helene; (c) failure to adequately respond to the Cobb family's repeated complaints regarding unsafe conditions, including the HVAC failure, recurring water intrusion, and persistent squirrel infestation in the attic and ceiling cavities; (d) failure to implement appropriate safety protocols to protect residents from toxic mold; (e) failure to properly install, maintain, or replace the home's HVAC system, which failed within approximately seven months of move-in and subjected the family to interior temperatures exceeding eighty degrees for approximately two and a half weeks; (f) closing multiple maintenance requests as "complete" without any technician visiting the home while representing that the air-conditioning system was functioning properly; (g) performing only cosmetic or surface-level repairs—including repeatedly patching the cracked master-shower shelf with spackle and wiping visible mold from vents—without investigating or remediating the underlying conditions; (h) failing to conduct adequate mold testing, and omitting the mold near the oven hood from In-Depth Environmental's written report even after Harbor Bay's own Environmental Supervisor acknowledged the growth was "absolutely mold"; (i) conducting mold

remediation with the home's HVAC turned off, no dehumidifiers operating, and deficient containment, thereby further exposing and contaminating the family's household belongings; and (j) failing to relocate the family on a timely basis, resulting in four separate displacements totaling more than four months.

61. Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

62. Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' home.

63. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT III: Gross Negligence**
**(against all Defendants)**

64. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

65. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

66. As the owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty

to maintain Plaintiffs' home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

67. As property manager for Plaintiffs' home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

68. Defendants were aware that circumstances in Plaintiffs' home constituted an imminent or clear and present danger amounting to more than normal or usual peril with tenants often complaining to Defendants of mold and illnesses.

69. Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) failure to remediate defects that would cause moisture intrusion and microbial growth; (b) failure to reasonably repair and remediate the family's repeated complaints of water intrusion, mold, and pest infestation; (c) failure to implement appropriate safety protocols to protect residents from toxic mold; (d) failure to properly install, maintain, or replace the home's HVAC system, leaving the family in interior temperatures exceeding eighty degrees for approximately two and a half weeks; (e) closing maintenance requests as "complete" without any technician visiting the home while representing that the air-conditioning system

was functioning properly; (f) failure to warn Plaintiffs that they were being exposed to toxic mold; (g) dismissing the family's reports of water intrusion and warped flooring as "nothing wrong" and "not that bad," and dismissing visible mold near the oven hood as "just dirt" before omitting it from the environmental report; (h) performing cosmetic repairs—including repeatedly spackling the cracked shelf and wiping mold from vents—that disguised rather than remediated the underlying conditions; (i) conducting mold remediation with the HVAC turned off, no dehumidifiers operating, and deficient containment, further contaminating the family's belongings; and (j) engaging in additional safety violations and breaches of the duty of care to be determined upon discovery.

70. Each of the Defendants' reckless indifference to the rights of Plaintiffs is equivalent to an intentional violation of them.

71. As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT IV: Omitted**

**COUNT V: Negligent Infliction of Emotional Distress**
**(against all Defendants)**

72. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

73. By their acts and omissions, Defendants caused Plaintiffs to be exposed to, come into direct physical contact with, and ingest and/or inhale mold within their home as well as be exposed to pests and other hazardous conditions.

74. As a result of that physical contact and exposure, Plaintiffs suffered physical injury, including, but not limited to, respiratory illness, allergic reactions, skin conditions, and other bodily harm.

75. As a direct consequence of these physical injuries, Defendants caused the Plaintiffs to suffer severe emotional distress, including worry, anxiety, anguish, suffering, and grief.

76. Plaintiffs suffered additional physical injuries as a result of the emotional distress.

77. Plaintiffs' claims for emotional distress arise directly from physical impacts and resulting physical injuries caused by Defendants' conduct. Each Plaintiff sustained direct physical contact with toxic mold within the home, and the members of the family suffered resulting physical injuries, including such conditions as respiratory illness, allergic reactions, skin conditions, and other bodily harm documented in this Complaint. Plaintiffs' emotional distress arises from, and is accompanied by, physical manifestations and injuries.

78. Defendants knew or should have known that Plaintiffs' home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and would result in physical harm to Plaintiffs.

79. Defendants knew or should have known that their statements that remediation was complete were, in fact, assurances that Plaintiffs' home was safe and not infested with mold, and that Plaintiffs would rely on those assurances and continue to occupy the home and suffer emotional and physical injury.

80. As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with mold.

81. Plaintiffs suffered severe emotional distress as a result of that unhealthy and dangerous contact. Plaintiffs suffered physical injury as a result of the emotional distress.

82. Defendants are liable for the consequences that they knew or should have known would occur because of their negligent conduct.

83. Plaintiffs have suffered, are suffering, and will continue to suffer severe emotional distress and associated harms because of Defendants' acts and omissions.

**COUNT VI: Intentional Infliction of Emotional Distress**
**(against all Defendants)**

84. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

85. Defendants intentionally and knowingly subjected Plaintiffs to housing conditions that were unsafe and unhealthy.

86. Defendants also misled Plaintiffs into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiffs into remaining in their home by falsely claiming that they would eliminate those dangers.

87. This intentional conduct, which subjected Plaintiffs to risk of serious injury or illness over a prolonged period, was extreme and outrageous.

88. Intentionally subjecting the Plaintiffs to such dangerous conditions and taking actions to ensure their continued exposure is beyond all possible bounds of decency and intolerable in a civilized community.

89. This conduct caused severe emotional distress, as Plaintiffs suffered serious injuries and watched their loved ones get sick, and eventually understood that they were constantly in grave danger in their own home.

90. Plaintiffs suffered emotional and physical injury due to their severe emotional distress.

**COUNT VII: Breach of the Warranty of Habitability**
**(against Defendant AMC)**

91. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

92. AMC breached express and implied warranties of habitability.

93. AMC owed Plaintiffs a duty to provide them with habitable living conditions, under FLA. STAT. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiffs' home. AMC failed to meet the standard of care in performing those duties. Upon information and belief, in their lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

94. AMC failed to live up to its duty to inspect the Plaintiffs' home prior to their moving in, in order to make necessary repairs, and transfer them to a reasonably

safe home.

95. After Plaintiffs moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The presence of moisture and mold in Plaintiffs' home was a dangerous condition that AMC should have remediated.

96. As a result of AMC's breach of the express and implied warranties of habitability, Plaintiffs suffered substantial physical injuries—including the persistent respiratory symptoms the family experienced while residing in the home, the sinus conditions for which both GySgt and Ms. Cobb required surgery, and the adenoid condition for which the Cobbs' oldest child required surgery—as well as damage to their personal property and other financial harm. This claim is brought to recover on account of those physical injuries.

**COUNT VIII: Third-Party Beneficiary Contract**
**(against all Defendants)**

97. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

98. Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

99. The Operating Agreement originally entered into by AMC East, LLC and the Air Force creating AMC contains language establishing that Plaintiffs were intended beneficiaries of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any

Operating Agreement under which AMC presently operates continues to contain such or similar language.

100. On information and belief, the Ground Lease, entered into by the Air Force and AMC, also contains language indicating that Plaintiffs were intended beneficiaries.

101. On information and belief, property management agreements governing Defendants' property management practices at MacDill also contain provisions indicating that Plaintiffs were intended beneficiaries of those agreements.

102. Defendants and the Air Force intended to benefit the service members living at MacDill. GySgt Cobb is a servicemember living at MacDill with his family. The obligations to provide these intended benefits were included in the underlying contracts to ensure military service members, including Plaintiffs, would be provided with safe and habitable housing.

103. Defendants breached the requirements of the underlying contracts by failing to provide suitable management, maintenance, operations, and renovations of Plaintiffs' home.

104. Defendants also breached the duty of good faith and fair dealing implied in the contracts.

105. As a foreseeable result of the Defendants' breaches of the contracts, Plaintiffs, who are intended, direct, third-party beneficiaries of such contracts, sustained damages.

**COUNT IX: Negligence Per Se**
**(against all Defendants)**

106. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

107. Defendants owed Plaintiffs a duty to take steps to protect them from the specific injuries outlined in this Complaint.

108. This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

109. For example, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following standard." It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

a) "*General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." Tampa Code of Ordinances § 19-231(17);

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." *Id.* §19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." *Id.* § 19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered

with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." *Id.* § 19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." *Id.* § 19-231(14)(b).

110. Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." *Id.* § 19-232(7).

111. Defendants also failed to comply with § 19-47, which provides that, "Nothing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of the emission of odors, gases, dust, smoke, light, vibration or noise … nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community." *Id.* § 19-47.

112. Plaintiffs are members of the class that each of the above statutes were designed to protect.

113. The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

114. Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01 and any other applicable statutes, codes, and regulations governing the habitability of

residential housing and the health and safety of occupants.

115. The violations of these statutes constitute negligence per se and were the proximate cause of the physical injuries the Cobb family suffered, including their persistent respiratory symptoms and the sinus and adenoid conditions requiring surgery. This claim is brought to recover on account of those physical injuries.

**COUNT X: Medical Monitoring**
**(against all Defendants)**

116. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

117. Plaintiffs suffered physical injuries when they were exposed to hazardous mold, as described in this Complaint.

118. As a result of their prolonged exposure to moisture-damaged indoor environments and associated microbial contamination at 7414 Chevron Park Drive, the Cobb family faces an increased and individualized risk of developing chronic and latent health conditions.

119. GySgt Cobb and Ms. Cobb each developed sinus conditions during the period of exposure that ultimately required surgery (sinuplasty), and Ms. Cobb additionally suffered unexplained gastrointestinal pains and insomnia that improved after the family relocated; each requires ongoing medical evaluation and monitoring.

120. The Cobbs' oldest child required surgical removal of his adenoids, and the family experienced persistent respiratory symptoms while residing in the home that improved after relocation.

121. All minor Plaintiffs, whose immune and respiratory systems are still

developing, face heightened long-term vulnerability from prolonged mold exposure, making early and ongoing monitoring critical.

122. The significant toxic mold later identified in the home by the Cobb family's independent mold inspector, together with the mold Defendants discovered within the walls behind the bathtub, corroborates the family's exposures and informs the monitoring reasonably necessary for each Plaintiff according to contemporary scientific principles.

123. Early detection through monitoring is material because the chronic and latent conditions associated with Penicillium and Aspergillus exposure — including hypersensitivity pneumonitis, allergic sensitization, and immune-mediated inflammatory disease—may not manifest clinically for months or years after the exposure ends. The monitoring protocols required will differ for each Plaintiff based on their individual presentations, but each member of the Cobb family would benefit from regular evaluation.

124. The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

125. Given the exposure, monitoring regimes are reasonably necessary according to contemporary scientific principles.

126. Plaintiffs are entitled to the cost of medical monitoring necessary to detect the onset or worsening of physical harm and/or, in the alternative, that the court use its equitable powers to create and supervise a medical monitoring fund.

**COUNT XI: Unjust Enrichment**
**(against Defendant AMC)**

127. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

128. Plaintiffs conferred a benefit on AMC in the form of the BAH rent that the military transferred on their behalf. These funds belonged to Plaintiffs and were paid to AMC in return for safe and habitable housing at MacDill Air Force Base.

129. AMC failed to provide Plaintiffs with a safe and habitable home, and it failed to fully compensate Plaintiffs for the costs and inconvenience of their repeated displacements—four separate times over the course of their tenancy, totaling more than four months—while Defendants performed remediation activities, and ultimately failed to deliver the safe and habitable housing for which Plaintiffs' BAH was paid. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiffs.

130. Plaintiffs are entitled to restitution of some or all of the BAH funds paid to AMC.

**COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Unfair Conduct)**
**(against all Defendants)**

131. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

132. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

133. At all relevant times, Defendants solicited, advertised, offered, and/or

provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

134. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA. *Id.*

135. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

136. On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and procedures for the treatment and remediation of mold.

137. Defendants' acts and practices exposed Plaintiffs to unsafe and unhealthy conditions, including toxic mold, pests, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

138. Given those unconscionable conditions, Plaintiffs' interests in their MacDill home were only worth a small fraction of the rental payments for that home.

139. Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

140. As a result of Defendants' unfair and unconscionable acts or practices,

Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT.§ 501.211.

**COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct) (against all Defendants)**

141. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

142. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

143. At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, see *id., e.g.*, § 501.203.

144. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see id.*

145. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

146. On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiffs, engaged in deceptive acts and practices, including the following:

(a) Defendants concealed facts and made deceptive assurances that

caused Plaintiffs to sign a lease that they never would have signed had they known the truth;

(b) Defendants made false, misleading, and/or deceptive representations that Plaintiffs' MacDill home was in habitable condition and thus far more valuable than it was in reality;

(c) on information and belief, in the lease between Defendants and Plaintiffs, Defendants falsely warranted that Plaintiffs' housing was safe, habitable, and free from defects;

(d) Defendants failed to disclose information that they knew about the condition of Plaintiffs' housing with the intention of inducing Plaintiffs into leasing the home at a cost beyond what it was actually worth;

(e) once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants falsely claimed that they would mitigate or fix those problems;

(f) Defendants made false, misleading, and/or deceptive representations that repairs and remediation efforts were performed completely and to the standard of care required of professional landlords; and

(g) Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts.

147. As a few examples, Defendants falsely (a) represented, through Assistant Community Director Geri Leto and an unknown Harbor Bay maintenance technician during the walkthrough, that the home was "safe, clean, and sturdy," that prior repairs

had been completed, that "there would be no issues," and that the residence would be free of mold and pests; (b) provided an incomplete seven-year maintenance history reflecting only HVAC issues and inspections that hid the true extent of the hazards in the home; (c) represented, through former Environmental Supervisor Mike Whitman, that there was "nothing wrong" with the home and that the warped flooring was "not that bad"; and (d) represented that the air-conditioning system was functioning properly while closing maintenance requests as "complete" without any technician visiting the home.

148. As a result of Defendants' deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT.§ 501.211.

149. Plaintiffs paid far more in rent than their home was actually worth.

150. Due to their role in the leasing and/or management and maintenance of the Plaintiffs' home at MacDill, Defendants were uniquely aware of the condition of Plaintiffs' home, maintenance history, defects in design, the need for repairs, remodeling, and remediation, and the existence of mold and other hazardous conditions.

151. As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. *Id.* § 501.211.

**COUNT XIV: Negligent Misrepresentation Concerning Condition of the Home**
**(against all Defendants)**

152. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

153. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

154. Defendants either knew that Plaintiffs' home was unsafe and unfit for human habitation, made representations concerning the safety and habitability of the home without knowledge of their truth or falsity, or should have known that such representations were false.

155. Defendants intended to convince Plaintiffs to sign a lease and move into their home based on these representations.

156. Before the Cobb family accepted the residence, and in response to Ms. Cobb's specific questions during the walkthrough about the condition of the home, Harbor Bay Assistant Community Director Geri Leto represented that MacDill housing was "safe, clean, and sturdy" and in "much better and more livable condition" than housing at other military installations, and an unknown Harbor Bay maintenance technician assured the family that prior repairs had been completed, that "there would be no issues," that management was "aggressive with remediation," and that the residence would be free of mold and pests. On information and belief, Defendants also provided the Cobbs an incomplete seven-year maintenance history reflecting only HVAC issues and inspections—implying the HVAC was in good working condition—while omitting the true extent of the hazards within the home. Defendants knew or should have known that all of those representations were false when made.

157. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions to move into their home.

158. Plaintiffs justifiably relied on Defendants' assurances that their home was safe, mold-free, and fit for human habitation at the time that they moved in.

159. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT XV: Negligent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

160. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

161. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiffs to remain in their home.

162. Defendants falsely represented that hazardous and unsafe conditions, including mold and elevated indoor moisture, were innocuous or easily fixed conditions. Defendants knew or should have known that this was untrue.

163. Defendants falsely told Plaintiffs that there was no moisture in their home, when they knew or should have known that there was moisture.

164. When Plaintiffs requested that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they would never

take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

165. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

166. Defendants intended to convince Plaintiffs to remain in their home and continue paying their BAH based on these false representations.

167. As a few examples, Defendants falsely (a) represented, through former Environmental Supervisor Mike Whitman, that "there's nothing wrong" with the home and dismissed the warped flooring caused by the post-Hurricane Helene water intrusion as "not that bad," when, in reality, the moisture conditions persisted and caused mold to form; (b) represented, through InDepth Environmental's inspector Lane Middleton, that visible growth near the oven hood was "just dirt" and that only vent cleaning and flooring repairs were necessary, and then omitted that mold from IDE's written report—even after Mr. Whitman acknowledged the growth was "absolutely mold"—while conducting no formal mold testing; (c) represented that the home's air-conditioning system was functioning properly while closing multiple maintenance requests as "complete" without any technician visiting the home; and (d) represented, through Community Director Candice Rosalez, that the HVAC system would remain operational and dehumidifiers would run inside the home during the family's displacement, when in fact the HVAC was turned off, no dehumidifiers were operating, and the containment was deficient, further contaminating the family's

belongings.

168. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions whether to remain in their home.

169. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

170. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial damages, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVI: Fraudulent Inducement**
**(against all Defendants)**

171. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

172. Defendants deliberately, willfully, and knowingly made false and material statements regarding the habitability and safety of Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign a lease and move into their home.

173. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

174. These representations were material to Plaintiffs' decisions to enter into their lease causing Plaintiffs' BAH to be paid to Defendants.

175. Before the Cobb family accepted the residence, and in response to Ms. Cobb's specific questions during the walkthrough about the condition of the home—asked after she had contacted the prior resident about earlier air-conditioning and moisture problems—Harbor Bay Assistant Community Director Geri Leto represented that MacDill housing was "safe, clean, and sturdy" and in "much better and more livable condition" than housing at other military installations, and an unknown Harbor Bay maintenance technician assured the family that prior repairs had been completed, that "there would be no issues," that management was "aggressive with remediation," and that the residence would be free of mold and pests. On information and belief, Defendants also provided the Cobbs an incomplete seven-year maintenance history reflecting only HVAC issues and inspections—implying the HVAC was in good working condition—while omitting the true extent of the hazards within the home. Those representations were false when made.

176. Plaintiffs relied on Defendants' assurances that their home was safe and fit for human habitation at the time that they moved in.

177. Defendants knew or reasonably should have known that these statements, including the representations in the lease, were false. But for the Defendants' false statements, Plaintiffs would not have signed the lease for their MacDill Air Force Base home.

178. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require ongoing medical testing/monitoring,

as well as mental and emotional distress related to those physical injuries.

**COUNT XVII: Fraudulent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

179. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

180. Defendants, including via Harbor Bay, deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing, in order to cause Plaintiffs to remain in their home and continue paying their BAH notwithstanding the unsanitary and dangerous conditions in it.

181. Defendants made false statements to Plaintiffs that their home was suitable for habitation throughout the course of Plaintiffs' residence in the home.

182. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants consistently, deliberately, and falsely downplayed the severity of those problems. Defendants knew the true severity of those conditions, having themselves inspected and performed repair work at the home.

183. When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take steps to mitigate or fix those problems. Defendants knew that they would never do so, as demonstrated by their repeated pattern of performing only cosmetic or temporary repairs and wiping visible mold, instead of addressing the underlying HVAC and moisture defects.

184. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when Defendants knew, from their own technicians' prior

visits to the home, that they had not adequately done so.

185. As a few examples, Defendants falsely (a) represented, through former Environmental Supervisor Mike Whitman, that "there's nothing wrong" with the home and dismissed the warped flooring caused by the post-Hurricane Helene water intrusion as "not that bad," when the moisture conditions persisted and caused mold to form; (b) represented, through InDepth Environmental's inspector Lane Middleton, that visible growth near the oven hood was "just dirt" and that only vent cleaning and flooring repairs were necessary, and then omitted that mold from IDE's written report—even after Mr. Whitman acknowledged the growth was "absolutely mold"—while conducting no formal mold testing; (c) represented that the home's air-conditioning system was functioning properly while closing multiple maintenance requests as "complete" without any technician visiting the home; and (d) represented, through Community Director Candice Rosalez, that the HVAC system would remain operational and dehumidifiers would run inside the home during the family's displacement, when in fact the HVAC was turned off, no dehumidifiers were operating, and the containment was deficient, further contaminating the family's belongings.

186. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

187. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

188. These representations were material to Plaintiffs' decisions to remain in their home.

189. But for Defendants' false statements, Plaintiffs would not have remained in their MacDill Air Force Base home.

190. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVIII: Fraudulent Concealment of Condition of Housing**
**(against all Defendants)**

191. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

192. Defendants deliberately, willfully, and actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing in order to cause Plaintiffs to sign a lease and move into their MacDill home.

193. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

194. On information and belief, Defendants provided the Cobbs an incomplete seven-year maintenance history that reflected only HVAC issues and inspections, implying the home's HVAC was in good working condition, while concealing the true extent of the hazards within the home—including the conditions that would soon require an HVAC replacement, repeated water intrusion, extensive mold remediation, and four separate displacements of the family.

195. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of hazardous and unsafe conditions in their home.

196. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

197. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to sign a lease and move into their home and should have been disclosed.

198. Defendants knew that their concealments would induce Plaintiffs to act.

199. Plaintiffs relied on Defendants' concealments and omissions.

200. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have signed the lease or moved into their MacDill Air Force Base home.

201. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

202. Plaintiffs incorporate the allegations set forth in paragraphs 1–49.

203. Defendants, including through Harbor Bay, deliberately, willfully, and

actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to remain in their MacDill Air Force Base home.

204. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of continuing hazardous and unsafe conditions in their home.

205. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

206. As a few examples, Defendants falsely (a) represented, through former Environmental Supervisor Mike Whitman, that "there's nothing wrong" with the home and dismissed the warped flooring caused by the post-Hurricane Helene water intrusion as "not that bad," when the moisture conditions persisted and caused mold to form; (b) represented, through InDepth Environmental's inspector Lane Middleton, that visible growth near the oven hood was "just dirt" and that only vent cleaning and flooring repairs were necessary, and then omitted that mold from IDE's written report—even after Mr. Whitman acknowledged the growth was "absolutely mold"—while conducting no formal mold testing; (c) represented that the home's air-conditioning system was functioning properly while closing multiple maintenance requests as "complete" without any technician visiting the home; and (d) represented, through Community Director Candice Rosalez, that the HVAC system would remain operational and dehumidifiers would run inside the home during the family's displacement, when in fact the HVAC was turned off, no dehumidifiers were operating, and the

containment was deficient, further contaminating the family's belongings.

207. Defendants fraudulently concealed ongoing dangers in the home by engaging in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiffs that repairs had been successfully completed.

208. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their home and should have been disclosed.

209. Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

210. Plaintiffs relied on Defendants' concealments and omissions.

211. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have remained in their MacDill Air Force Base home.

212. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

a. Past and future physical pain and suffering;

b. Past and future mental anguish and emotional distress;

c. Past and future medical, healthcare, and attendant care expenses;

d. Past and future lost income and earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Increased risk of future harm and medical monitoring for life;

i. Loss of life expectancy;

j. Nuisance damages, including inconvenience, illness, and fear;

k. Out of pocket expenses;

l. Loss of and/or damage to personal property;

m. Costs, expenses, and fees, including attorneys' fees; and

n. Punitive damages.

**PRAYER FOR RELIEF**

Plaintiffs pray that this Court:

A. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII, IX, XIV, XV, XVI, XVII, XVIII, XIX, in an amount to be determined at trial;

C. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by

law, and;

D. Grant the Plaintiffs such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED: August 25, 2026.

Respectfully submitted,

*/s/ Robert J. McKee*
Robert J. McKee
Florida Bar No.: 972614
THE MCKEE LAW GROUP, LLC
2800 South Flamingo Road
Davie, Florida 33330
Tel: (954) 888-9877
Fax: (954) 217-0150
Email: rmckee@themckeelawgroup.com
Lead Counsel

Vincent J. Colatriano*
Michael Weitzner*
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: 202-220-9600
Fax: 202-220-9601
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

Kristina Baehr*
Christopher LaCour*
**JUST WELL LAW, PLLC**
1809 Pearl Street
Austin, Texas 78701
Tel: (512) 693-8029
Email: Kristina@well.law
Email: Chris@well.law

Email: Militaryhousing-lit_PLslistserv@well.law

**Pro Hac Vice forthcoming*
*Attorneys for Plaintiffs*